**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRENDAN BOEHNER, ALANALEILANI CONNOLLY, CAROLYN DELVECCHIO HOFFMAN, REBECCA GOLDFEDER, SOLOMON GOMINIAK, RYAN HOWE, NICOLE LINDQUIST, SUSANNA MOORE, RYAN MULLANEY, BARBARA RIVERA, ALYSON TROMBULAK, and BETTY WOLFANGER, <br><br> Plaintiffs, <br><br> -against- <br><br> THE CITY OF ROCHESTER, a municipal entity, FRANCIS ARCHETKO, WHITNEY CELENTANO, THOMAS KIRK, DARYL HOGG, KAITLYN TURNER, JEREMY ANZALONE, "JOHN DOE POLICE OFFICERS 1-200" (names and number of whom are unknown at present), COUNTY OF MONROE, TODD BAXTER, "RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names and number of whom are unknown at present), and other unidentified members of the Rochester Police Department and Monroe County Sheriff's Office, <br><br> Defendants. | 21-CV-6574 (FPG) <br><br> **FIRST AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs BRENDAN BOEHNER, ALANALEILANI CONNOLLY, CAROLYN DELVECCHIO HOFFMAN, REBECCA GOLDFEDER, SOLOMON GOMINIAK, RYAN HOWE, NICOLE LINDQUIST, SUSANNA MOORE, RYAN MULLANEY, BARBARA RIVERA, ALYSON TROMBULAK, and BETTY WOLFANGER, by their attorneys, ROTH & ROTH, LLP and EASTON THOMPSON KASPAREK SHIFFRIN LLP, complaining of the defendants, respectfully allege as follows:

## I.     PRELIMINARY STATEMENT

"But somewhere I read of the freedom of assembly. Somewhere I read of the freedom of speech. Somewhere I read of the freedom of press. Somewhere I read that the greatness of America is the right to protest for rights."

- Martin Luther King, Jr., I've Been to the Mountaintop (April 3, 1968), http://kingencyclopedia.stanford.edu/encyclopedia/documentsentry/ive_been_to_the_mo untaintop

1

1.      The document to which Nobel Laureate, Dr. Martin Luther King, Jr., referred is the First Amendment to the United States Constitution. Unfortunately, some of the members of the Rochester Police Department and the Monroe County Sheriff's Office had no regard for the rights secured by this bedrock principle of American democracy. This case is the sad tale of police officers and Sheriff's Deputies, clothed with the awesome power of the state, run amok.

2.      Because cell phones captured Derek Chauvin's murder of George Floyd, and body worn cameras captured RPD officers killing of Daniel Prude, the world stopped. Last year's protests in the aftermath of Mr. Floyd and Mr. Prude's deaths reignited the flashpoint around which this case revolves—the accessibility and protection of constitutional rights. Dr. King's words serve as a reminder that progress is not linear and that history is both a collective diary and a mirror. As detailed below, the march continues.

3.      The Plaintiffs are thirteen individuals who joined protests or were proximate to protests in their capacity as legal observers to document police interactions with protesters during the summer and fall of 2020. Defendants are the City of Rochester ("CITY") certain employees and agents of the Rochester Police Department ("Police Department" and "RPD"), the County of Monroe ("COUNTY") and Monroe County Sheriff TODD BAXTER, and certain RPD officers and Sheriff's Deputies whose identities are not yet known.

4.      The Plaintiffs seek compensatory and punitive damages and such other and further relief as this Court deems just and proper for injuries resulting from Defendants' violent and unjustified use of force against them at a May 30, 2020 protest in the vicinity of Exchange Boulevard near the Public Safety Building ("PSB"), and at various other racial justice protests in Rochester after the video of RPD officers killing Daniel Prude was released on September 2, 2020.

5.      This lawsuit seeks to hold the CITY and COUNTY liable under *Monell* v. *Department of Soc. Svcs.*, 436 U.S. 658 (1978) for their unlawful policies of responding to protesters lawfully exercising their First Amendment rights with extreme and unnecessary force, including the use of tear gas, pepper balls and other chemical weapons. Defendants knew or should have known that these chemical weapons—which are banned in warfare—can cause serious physical harm, including damage to the female reproductive system.

6.      As a result of being exposed to tear gas, pepper spray, pepper balls and other chemical weapons by Defendants at protests in May and September 2020, nearly all the female Plaintiffs experienced menstrual irregularities. Increased cramps, unusual spotting and uncharacteristically intense or long bleeding were the most common reactions. A number of people who don't usually have periods because of hormone therapy or age reported unexpected bleeding and spotting.

7.      The Plaintiffs also suffered other damages, such as physical pain from being shot with pepper balls and hit with batons, and mental and emotional damages from the violent militarized response of the RPD Officers and Sheriff's Deputies to peaceful protesters calling for justice for Daniel Prude and an end to the RPD's racist and brutal policing practices, and call for new visions of public safety that value Black lives.

II.     **PARTIES**

4.      Plaintiffs BRENDAN BOEHNER, ALANALEILANI CONNOLLY, CAROLYN DELVECCHIO HOFFMAN, REBECCA GOLDFEDER, SOLOMON GOMINIAK, RYAN HOWE, NICOLE LINDQUIST, SUSANNA MOORE, RYAN MULLANEY, BARBARA RIVERA, ALYSON TROMBULAK, and BETTY WOLFANGER are citizens of the United States and residents of the County of Monroe, State of New York.

5.     Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the RPD.

6.     Defendant CITY OF ROCHESTER ("CITY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

7.     Defendant CITY maintains the City of Rochester Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department. RPD acts as Defendant CITY's agent and Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers.

8.     SERGEANT FRANCIS ARCHETKO ("ARCHETKO"), OFFICER WHITNEY CELENTANO ("CELENTANO"), OFFICER THOMAS KIRK ("KIRK"), OFFICER DARYL HOGG ("HOGG"), OFFICER KAITLYN TURNER ("TURNER"), LIEUTENANT JEREMY ANZALONE ("ANZALONE"), "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Police Officers with the RPD. At all relevant times, these defendants were acting within the scope of their employment with the CITY and RPD and under color of state law. They are sued in their individual capacities. The John Doe RPD Officers, ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE are referred to collectively as "the RPD officers."

9.     Defendant COUNTY OF MONROE ("COUNTY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

10.     Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times, Defendant BAXTER was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity.

11.     "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the Monroe County Sheriff's Office ("MCSO"). At all relevant times, these defendants were acting within the scope of their employment with the County and under Sheriff BAXTER and acting under color of state law. They are sued in their individual capacities. They are referred to collectively as "the Sheriff's Deputies."

12.     BAXTER is responsible for the training, supervision and discipline of the Defendant Sheriff's Deputies under state law.

### III.  JURISDICTION AND CONDITIONS PRECEDENT

13.     This Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over claims arising out of violations of the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

14.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Western District of New York, the judicial district where the claims arose and in which the Defendants conduct business.

15.     Plaintiffs filed timely Notices of Claim against the City and County, in compliance with the Municipal Law § 50.

16.     The CITY and the COUNTY waived 50-h hearings for each Plaintiff, other than CONNOLLEY, who sat for a 50-h hearing by the CITY on June 11, 2021.

17.     More than thirty (30) days have elapsed since service of said Notices of Claim were filed and the City and County have failed to pay or adjust the claim.

18.     This action was filed brought within a year and 90 days of the event that gives rise to Plaintiffs' causes of action under New York State law and Plaintiffs have complied with all of the statutory prerequisites for bringing this action.

## IV.  STATEMENT OF FACTS

### A.  Allegations Common to All Causes of Action and Plaintiffs

19.     On May 25, 2020, Minneapolis police officer Derek Chauvin murdered George Floyd, who was handcuffed and lying face down on the ground, by suffocating him to death in broad daylight on the street.

20.     Floyd's murder and the police murder of Breonna Taylor in Louisville, Kentucky, in addition to recent police murders of other Black people in the United States sparked the largest movement for social and racial justice in history and has included peaceful protests around the world against anti-Black police violence, systemic racism, and inequality.

21.     In Rochester, as detailed below, each of the Plaintiffs attended a protest in front of the Public Safety building on May 30, 2021, where they were attacked by Rochester Police Department Officers and Sheriff's Deputies, who pushed and hit them with batons, shot them with pepper balls, and tear gassed and pepper sprayed them.

22.     Months before George Floyd's murder, on March 23, 2020, Daniel Prude's family sought help from the RPD as Daniel was suffering an acute mental health crisis. Tragically, that call for help ended with Daniel naked and handcuffed with his face covered by a "spit hood," as

6

an RPD officer pushed his head into the freezing asphalt for several minutes. RPD officers on the scene mocked Daniel and chatted with each other while he asphyxiated. Daniel was declared brain dead that night; he was taken off life support and died on March 30.

23.     When the video of RPD Officers killing Daniel Prude was finally made public on September 2, 2020, it sparked nationwide outrage. In Rochester, thousands of people gathered to mourn the loss of Black lives, demand the CITY finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

24.     Protesters gathered outside the PSB and in downtown Rochester, chanted, and held signs. Some of the protesters' chants and signs were specific to Daniel Prude; others decried the pattern of racialized, violent policing in Rochester, of which Mr. Prude's killing was the latest, most egregious example.

25.     The largest of these protests took place between September 2 and September 6, 2020. The RPD and MCSO responded to these protests with extreme and unnecessary force— including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions.

26.     Although termed "nonlethal" or "less-than-lethal" force, military-grade crowd control devices like those used by the RPD and Sheriff's Deputies involve serious risks of injury, and even death. Chemical irritants ("CIs"), like tear gas and pepper spray, are banned in warfare because they are indiscriminate weapons by design, especially when deployed by firing a grenade or canister. CIs can cause severe injury or death, and, even at low concentrations, exposure to tear gas presents a risk of serious, irreversible health effects.

27.     Over the course of three nights, from September 3 to September 5, 2020, RPD officers fired tear gas canisters 77 times into groups of protesters expressly gathered to support Black lives, at journalists and legal observers attempting to report on and record the abuse, and at medics there to provide care and safety to the protesters—often when people had no escape route to get away from the chemical clouds. The tear gas canisters are themselves projectile weapons; direct impact can cause significant blunt trauma, including bone fractures, lacerations and internal bleeding, and death.

28.     Over those three nights, RPD officers also discharged 6,100 pepper balls at people who had gathered to protest the Department's aggressive and racist policing. In fact, one RPD officer on the night of September 4, 2020, fired 148 pepper balls in the span of just twenty minutes, at a group of people who were penned in or "kettled" by police on the Court Street Bridge in downtown Rochester.

29.     RPD officers also shot protesters with 40mm direct-impact foam bullets—known as kinetic impact projectiles ("KIPS")—which can cause a range of injuries including death. KIPs are inherently inaccurate when fired from afar and so they often injure bystanders and strike vulnerable body parts of intended targets and bystanders. RPD officers fired Def Tec and CTS 40 mm munitions during the protests. The CTS website cautions that shots to the head, neck, thorax, heart, or spine can result in fatal or serious injury. Use of force reports by RPD officers detail deploying 40mm munitions at individuals' abdomens at the September 5 demonstration.

30.     Other indiscriminate, military-grade weapons employed by the RPD and Sheriff's Deputies and law enforcement included flash bang grenades and a Long Range Acoustic Device ("LRAD"), which is both a sound system and a sonic weapon that can cause permanent hearing damage.

31.    Sheriff's Deputies also deployed "less lethal" and/or military-grade weapons against peaceful protesters, including shooting pepper balls and other chemical weapons; they also pushed protesters and struck them with batons.

32.    On information and belief, BAXTER did not provide any training to the Sheriff's Deputies on how to safely use these "less lethal" and/or military-grade weapons against peaceful protesters; and or the training provided was inadequate.

33.    As part of the City and RPD's coordinated strategy, the CITY and the RPD asked the COUNTY and BAXTER, to send the Defendant Sheriff's Deputies to Rochester to police the protests.

34.    The CITY and the RPD requested that BAXTER send Sheriff's Deputies to create an intimidating law enforcement response that was militarized.

35.    Along with the RPD, BAXTER sent Sheriff's Deputies and contributed personnel and resources to create a massive police presence to confront those assembled in peaceful protest to call the RPD to account for its widespread use of violence against people of color.

36.    The multi-agency response was managed under a unified command system between the CITY and the RPD; the MCSO and BAXTER; and the State Police.

37.    Upon information and belief, former RPD Chief La'Ron Singletary oversaw the unified command system for the CITY and RPD.

38.    Upon information and belief, Defendant BAXTER oversaw the unified command system for the County and MCSO.

39.    Upon information and belief, on the nights of the protests detailed herein, Singletary was present in the RPD's Command Post and was overseeing and directing RPD

officers and other law enforcement officers' response to the protesters, including the use of specific tactics and weapons.

40.     Upon information and belief, on the nights of the protests detailed herein, Defendants BAXTER and other commanding officers of the MCSO and County were present in the MCSO Command Post and were overseeing and directing Sheriff's Deputies' response to the protesters and coordinating with Singletary and other RPD officials about the response to protesters, including the use of specific tactics and weapons.

41.     Peaceful protests continued in the months after these initial nights.

42.     As a result of the violent response of the RPD officers and Deputy Sheriffs, under the direction and control of the CITY, COUNTY and BAXTER, the Plaintiffs were injured and harmed, and their rights to free expression under the State and Federal Constitutions were suppressed.

### a.   May 30, 2020 Protest

43.     On May 30, 2020, Plaintiffs attended a peaceful protest in front of the Public Safety Building ("PSB") in downtown Rochester.

44.     Before any of the Plaintiffs arrived at the protest on May 30, 2020, law enforcement had closed Exchange Boulevard in the vicinity of the PSB to vehicular traffic.

45.     In response to the peaceful protest, Defendants and their employees and agents subjected Plaintiffs to grossly excessive and disproportionate force.

46.     As a peaceful demonstration took place, RPD officers and Sheriff's Deputies pepper sprayed protesters, indiscriminately shot pepper balls into the crowd, physically pushed protesters and struck them with batons.

47.     Officers also targeted and shot at journalists, legal observers, and people who were recording officers.

48.     As a result of the violent response of the RPD and MCSO on May 30, 2020, the Plaintiffs were injured and harmed, and their rights to free expression under the State and Federal Constitutions were suppressed.

49.     As a result of the chemical weapons used at the May 30, 2020 protest, each female Plaintiff experienced menstrual irregularities.

50.     Pursuant to policy, Defendants used types of force, such as by deploying pepper spray and indiscriminately shooting pepper balls into the crowd, that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances.

### b.  September 2, 2020 Protest

51.     On September 2, 2020, RPD officers and Sheriff's deputies erected barriers in front of the PSB, and closed Exchange Boulevard in the vicinity of the PSB to vehicular traffic. As a peaceful demonstration took place, RPD officers and Sheriff's Deputies pepper sprayed protesters and indiscriminately shot pepper balls into the crowd. Officers also targeted and shot at journalists, legal observers, and people who were recording officers.

52.     Pursuant to policy, Defendants used types of force, such as by deploying pepper spray and indiscriminately shooting pepper balls into the crowd, that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances

### c.  September 3, 2020 Protest

53.     On September 3, 2020, a group of peaceful protesters, assembled in front of the PSB. Again, RPD Officers and Sheriff's Deputies closed Exchange Blvd. in the vicinity of the PSB to vehicular traffic. Again, RPD officers and Sheriff's Deputies pepper sprayed protesters and indiscriminately shot pepper balls into the crowd. Officers also targeted and shot at journalists, legal observers, and people who were recording officers.

54.     RPD officers and Sheriff's deputies rushed protesters and struck them with batons, without cause or legal justification. RPD officers and Sheriff's deputies also indiscriminately shot pepper balls at demonstrators. Many shots were fired at head level, and struck protesters in the face, head and body. RPD officers also launched multiple tear gas cannisters into the crowd indiscriminately.

55.     Pursuant to policy, Defendants used types of force, such as by deploying pepper spray and indiscriminately shooting pepper balls into the crowd, that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances

### d.  September 4, 2020 Protest

56.     On September 4, RPD officers and Sheriff's Deputies used the Court Street bridge to "kettle" protesters, spray them with tear gas, and attack them with pepper balls—a scene tragically reminiscent of the 1965 "Bloody Sunday" attack on civil rights demonstrators on the Edmund Pettus Bridge in Selma, Alabama.

57.     Videos from that night show heavily armored phalanxes of police using pepper balls, 40mm kinetic bullets, tear gas, and batons to assault diverse groups of protesters outfitted

12

only with umbrellas, cardboard boxes, and plastic children's sleds against the Defendants' military-grade arsenal but who nevertheless assembled to protest for racial justice and reformed policing.

58.     After protesters had marched onto the bridge and had nowhere to go, the police ordered the protesters to "disperse." But when they were unable to immediately comply, suddenly, without giving the protesters the time or opportunity to disperse—*and knowing it was physically impossible for them to comply with the dispersal orders*—law enforcement officers began violently attacking protesters.

59.     After protesters retreated off the bridge, RPD officers and Sheriff's deputies continued to shoot them with pepper balls and other projectiles and attack them with chemical weapons.

60.     Pursuant to policy, Defendants used types of force, such as by deploying pepper spray and indiscriminately shooting pepper balls into the crowd, that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances

### e.  September 5, 2020 Protest

61.     On the night of Saturday September 5, 2020, RPD officers and Sheriff's deputies again used military grade weapons to attack peaceful protesters in downtown Rochester. RPD officers and Sheriff's deputies trapped peaceful protesters at the intersection of Broad Street and Exchange Boulevard, and almost immediately began attacking them. RPD officers and Sheriff's deputies began to launch flash bang grenades, release tear gas, and shoot pepper balls into the crowd indiscriminately.

62.     As videos of the law enforcement response on that night demonstrate, the John Doe RPD officers and Richard Roe Sheriff's Deputies, along with other law enforcement officers, unleashed a torrent of violence on the peaceful protesters—causing many protesters serious injury. One such video, incorporated herein, can be seen here: https://tinyurl.com/vra3x4j7.

63.     After several minutes of deploying chemical weapons, the police suddenly and without warning ran full speed towards the crowd at the intersection of Exchange Boulevard and Main Street, pushed them and struck them with batons.

64.     Another group of protesters dispersed towards City Hall. On the sidewalk in the vicinity of Church and Fitzhugh Streets, protesters encountered a group of police who stopped them. The police then rushed towards the protesters, as documented here: https://tinyurl.com/ydska5st.

65.     Another large group of injured protesters sought refuge from the police inside of Spiritus Christi church. Police surrounded the church and shot hundreds of rounds of pepper balls at the building, splattering its walls with chemical irritants. RPD Officer Dylan Minnick, for example, fired pepper balls at individuals who had taken shelter in the church's alcove.

66.     The Defendant John Doe RPD officers and Richard Roe Sheriff's Deputies lacked a lawful justification to force against any of the named plaintiffs—whose experiences are detailed below—or other protesters, as described above.

67.     Pursuant to policy, Defendants used types of force, such as by deploying pepper spray and indiscriminately shooting pepper balls into the crowd, that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances

### f.  September 12-13, 2020 Protest

68.     The night of September 12, 2020, several hundred peaceful protesters marched from the location where Daniel Prude was killed on Jefferson Avenue towards the RPD station on Child Street. RPD officers, Sheriff's deputies and State Police in riot gear blocked the road at the intersection of Child Street and Wilder Street, where they stopped the protesters.

69.     After stopping the peaceful march, the police issued dispersal orders but without giving the protesters an opportunity to disperse. Protesters were chanting and exercising their First Amendment rights to decry RPD's racist policing and demand change.

70.     Thereafter, in retaliation for what the RPD claimed was "anti-police rhetoric," the RPD MMF commander at the scene, Randy Potuck, issued an order for the officers to "move forward," and the police began violently attacking the protesters.

71.     First, the police unleashed chemical weapons, including tear gas and pepper spray.

72.     Then, the police rushed the protesters and pushed and struck them with batons.

73.     Other named plaintiffs were subjected to unconstitutional force by Defendants, as detailed below.

### g.  October 13, 2020 Protest

74.     On October 13, 2020, after attending a peaceful protest at the Webster Police Department organized by FTP ROC, Nicholas Wilt was arrested by a Monroe County Sheriff's Deputy. The Deputy claimed there was a bench warrant for Mr. Wilt for missing a court date for his September 12, 2020 arrest (during the protests described above). Mr. Wilt informed the Deputy that he had not missed a court appearance because his court date was October 22, 2020—not September 22, 2020, as the Deputy said. The Deputy still detained Mr. Wilt and transported him

to the PSB where the RPD confirmed that Mr. Wilt's court date was October 22, 2020. Nevertheless, RPD refused to release Mr. Wilt from custody.

75.     About 20 protesters arrived at the PSB to ask why Mr. Wilt was detained.

76.     Although the protesters were peaceful, an RPD supervisor ordered officers to "just push them." Officers suddenly, and without giving the protesters an opportunity to exit the building, began pushing protesters with batons towards the front doors, where a bottleneck occurred.

77.     Numerous RPD officers repeatedly struck protesters with their batons, causing numerous individuals to suffer serious injuries. At least several protesters sustained concussions.

78.     After protesters were eventually pushed outside, additional protesters arrived, including Plaintiff RYAN MULLANEY.

79.     Police responded with violence and chemical weapons. Mr. MULLANEY was targeted and shot from close range by John Doe RPD officers with pepper balls.

80.     On information and belief, no RPD officers have been disciplined for their excessive use of force on October 13, 2020.

   **B.  The City and RPD's Unlawful Policies and Negligence in Failing to Properly Train RPD Officers On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Officers Who Used Excessive Force Against Protesters.**

81.     The violation of Plaintiffs' rights is attributable to the CITY and RPD's disregard of many years of notice, criticism, and other relevant data points, both internal and external, related to its unconstitutional policing of similar protests.

82.     Since at least the 2009, the RPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies.

83.    Upon information and belief, the core training provided by the CITY related to protest response is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

84.    According to the CITY's website, the RPD's Mobile Field Force (MFF) is a "specially trained and equipped team providing a rapid, organized and disciplined response to civil disorder [and] crowd control."

85.    The MFF was the RPD's primary unit tasked with policing the peaceful protests in the wake of George Floyd and Daniel Prude in May and September 2020, respectively.

86.    Upon information and belief, the MFF's training and guidelines treat "disorders" as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, such as disorder control formations and mass use of chemical weapons.

87.    Such disperse and demoralize tactics have persisted through the present as exemplified by the experiences of Plaintiffs.

88.    Upon information and belief, the MFF's "civil disorder" training and guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations—only for large-scale civil disorder such as riots.

89.    However, neither the MFF's "civil disorder" training and guidelines, nor, upon information and belief, any related RPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

90.    For example, upon information and belief, there is virtually no RPD training—and certainly no *meaningful* RPD training—focusing on how to utilize the tactics described in the MFF's "civil disorder" training and guidelines without infringing on the constitutional rights of

protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

91.     Many MFF members have histories of engaging in the kinds of misconduct complained of herein, among other places, by CRB complaints, PSS investigations and in lawsuits.

92.     Examples of the RPD's unreasonable and discriminatory use of force at prior lawful protests include:

- In October 2009, an anti-war protest in Rochester resulted in several physical confrontations, with two protesters receiving stitches at the hospital after RPD officers pushed them face-first to the ground, and 12 protesters arrested for exercising their First Amendment rights. The peaceful march, held in the early evening, was interrupted by approximately forty RPD vehicles. Within three minutes of giving the order to disperse, RPD officers began to shove and hit protesters with clubs and deploy pepper spray. Protesters described RPD officers wading through the crowd to pick out Black students to arrest. A press videographer who was filming one such arrest was wrestled to the ground by police and himself arrested.

- In May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren reside. Though Ms. Perkins was peacefully demonstrating, RPD officers violently seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police brutality is a deeply personal issue to Ms. Perkins, as her daughter Lashedica was the 13-year-old shot three times by former-Deputy Chief Simmons in 2005.

- In July 2016, in Rochester as across the nation, people took to the streets to uphold the sanctity of Black lives and call for an end to racist policing. In response, the RPD deployed, beat, shoved, and pepper sprayed protesters. As one described it: "I started to turn and they tackled me to the ground.…They're beating citizens for no reason whatsoever. I wasn't doing anything. I was taking pictures." RPD officers, in keeping with their pattern and practice, particularly targeted Black protesters with unlawful force, including Black journalists: Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Over the course of one weekend, Rochester had more arrests at its BLM protest (74) than the rest of the nation combined.

93.    Despite the wealth of evidence of RPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in RPD training as it relates to constitutionally compliant protest policing.

94.    In fact, following the 2016 protest, the RPD and Mayor Lovely Warren's office stated the police handled themselves appropriately.

95.    When questioned by public officials, former RPD Chief La'Ron Singletary stated that he did not review the RPD's actions at the 2016 protest in developing the RPD's strategy for responding to protests in 2020.

96.    Instead, the City and RPD trained their officers to use even greater amounts of force, and changed their policies to allow more officers to use military style weapons against protesters.

97.     For example, between the May 30, 2020 protest and the September 2020 protests, the RPD quietly updated its departmental policy on usage of the PepperBall Launching System ("PLS"). Specifically, the Department amended the policy to allow officers on the patrol division to use the PLS. Prior to this amendment, only officers on the Special Weapons and Tactics ("SWAT") team were eligible to use PLS. The RPD did not update the policy in any other way.

98.     Under RPD General Order 630, an officer is ineligible to join the SWAT team if he has "any instance of sustained excessive force" or "serious" misconduct in his disciplinary history. The Patrol Division (or Mobile Field Force team) does not have any such eligibility requirement.

99.     On information and belief, the Department updated this policy to ensure more officers could (and would) be able to use the PLS in anticipation of protests after the suppressed footage of RPD officers killing Daniel Prude was released. By removing any "disciplinary history check," the Department knew or had reason to know that RPD officers would use excessive force when engaging with protesters—which they did.

100.    On information and belief, the CITY and the RPD failed to provide any training to RPD officers on how to use the PLS.

101.    Any training the CITY and the RPD provided to RPD officers on using the PLS was insufficient and inadequate.

102.    Although termed "nonlethal" or "less-than-lethal" force, military-grade crowd control devices like those used by the RPD involve serious risks of injury, and even death. Chemical irritants ("CIs"), like tear gas and pepper spray, are banned in warfare because they are indiscriminate weapons by design, especially when deployed by firing a grenade or canister. CIs can cause severe injury or death, and, even at low concentrations, exposure to tear gas presents a risk of serious, irreversible health effects.

103.   Over the course of three nights, from September 3 to September 5, 2020, RPD officers fired tear gas canisters 77 times into groups of protesters expressly gathered to support Black lives, at journalists and legal observers attempting to report on and record the abuse, and at medics there to provide care and safety to the protesters—often when people had no escape route to get away from the chemical clouds. The tear gas canisters are themselves projectile weapons; direct impact can cause significant blunt trauma, including bone fractures, lacerations and internal bleeding, and death.

104.   Over those three nights, RPD officers also discharged 6,100 pepper balls at people who had gathered to protest the Department's aggressive and racist policing. In fact, one RPD officer on the night of September 4, 2020, fired 148 pepper balls in the span of just twenty minutes, at a group of people who were penned in or "kettled" by police on the Court Street Bridge in downtown Rochester.

105.   RPD officers also shot protesters with 40mm direct-impact foam bullets—known as kinetic impact projectiles ("KIPS")—which can cause a range of injuries including death. KIPs are inherently inaccurate when fired from afar and so they often injure bystanders and strike vulnerable body parts of intended targets and bystanders. RPD officers fired Def Tec and CTS 40 mm munitions during the protests. The CTS website cautions that shots to the head, neck, thorax, heart, or spine can result in fatal or serious injury. Use of force reports by RPD officers detail deploying 40mm munitions at individuals' abdomens at the September 5 demonstration. On information and belief, the CITY and the RPD failed to provide any training to RPD officers on how to use the PLS, CIs, KIPS and other "less lethal" militarized weapons.

106.    Other indiscriminate, military-grade weapons employed by the RPD and law enforcement included flash bang grenades and a Long Range Acoustic Device ("LRAD"), which is both a sound system and a sonic weapon that can cause permanent hearing damage.

107.    Beyond these militarized weapons, RPD officers also struck countless peaceful protesters with their batons.

108.    On information and belief, the CITY and the RPD failed to provide any training to RPD officers on how to lawfully police protests and/or engage in peaceful crowd control.

109.    Any training the CITY and the RPD provided to RPD officers on policing protests and/or engaging in crowd control was insufficient and inadequate.

110.    Despite knowing that numerous protesters were seriously injured, RPD Officials, including then-Chief La'Ron Singletary, have defended the RPD's violent response to the protests, stating that the RPD "showed restraint" and that the tactics used were appropriate for the situation.

111.    Based on statements by City Officials and RPD command staff to date, no RPD officer has reported any fellow officer for their unlawful use of force and no RPD officers have been disciplined for their unlawful use of force on September 2, 3, 4 or 5, 2020, or any other dates relevant herein.

112.    Instead, the City has taken steps to ensure that important evidence of officer misconduct during these events was not preserved. Many RPD officers in their reports indicate that their body cameras "fell off" or "would not record" but state that cameras mounted on the PSB and/or Blue Light cameras around the City did or should have captured the timing and circumstances of their use-of-force on protesters. On September 14, the City acknowledged receipt of a preservation letter for all such video from the blue-light and PSB cameras—well within the 30-day retention period for those recordings. To date, the City has produced less than 3 minutes

of footage from the night of September 4. The City has indicated the rest of the footage was destroyed—despite the preservation letter and their own retention policies.

113.    Moreover, upon information and belief, the City and RPD's crowd control training instructed that:

- Not all protestors standing with their hands raised were peaceful;

- that children and the elderly were pawns and shields,

- that volunteers distributing water on a hot day were fomenting violence, and that

- protestors wearing protective gear for fear of RPD and other law enforcement using force against them were "not actually nonviolent," so officers needed to be "mentally prepared to use force" against them.

114.    The City and RPD's directives and instructions for its officers to collectively punish nonviolent demonstrators, even though using the force they had been trained to use, was palpably excessive.

115.    As to discipline, even though the RPD officers' video-recorded conduct was clearly improper, there have been no reports by officers of excessive force by others during the protests, no disciplinary actions or criminal charges for excessive force, and no efforts to relieve violent officers from duty or to remove them from any of the special protest response teams.

116.    In summary, upon information and belief, the RPD's exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that RPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates the City's unlawful policies and practices, and its negligence in failing to train and supervise RPD Officers

23

in properly and lawfully policing protests to ensure that protesters' rights under the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights are not violated.

117.    As a result of the CITY's unlawful policies and practices, Plaintiffs were injured and harmed, as described herein.

118.    As a result of the City's negligence, Plaintiffs were injured and harmed, as described more fully below.

C.    **The County's Unlawful Policies and Baxter's Negligence in Failing to Properly Train Sheriff's Deputies On The Proper Handling of First Amendment Assemblies.**

119.    Similarly, prior to 2020, BAXTER had received clear notice that peaceful demonstrations have occurred and will continue to occur in Monroe County, and that without proper training, his Deputy Sheriffs would violate individuals' constitutional rights and endanger the life and safety of protesters, such as Plaintiffs.

120.    BAXTER has deliberately disregarded the fact that peaceful protests and peaceful demonstrations have occurred and will continue to occur in Monroe County, and instead has trained his Deputies that such lawful First Amendment activities constitute "civil disturbances" that mut be policed in the same manner as "violent mobs" or "riots."

121.    BAXTER, upon information and belief, took no steps to train his Sheriff's Deputies on lawfully policing protests and other First Amendment activities.

122.    Instead, BAXTER, pursuant to the County's Hazard Mitigation Plan, trains his Sheriff's Deputies that a "civil disturbance" is defined as both "peaceful demonstrations or acts of violence."

123.   Upon information and belief, the Hazard Mitigation Plan was in full force and effect at all times relevant herein.

124.   Upon information and belief, prior to 2020 and at all times relevant herein, the COUNTY had implemented the Hazard Mitigation Plan, and BAXTER trained his Sheriff's Deputies in accordance with its mandates. Thus, the COUNTY and BAXTER explicitly conflate peaceful protests and peaceful demonstration with violent riots.

125.   Upon information and belief, BAXTER did not provide any training to Sheriff's Deputies on drawing a meaningful distinction between "peaceful demonstrations" and "violent mobs". For example, in its "Hazard Mitigation Plan," the COUNTY states that, "Many civil unrest incidents are spontaneous and can occur at any time, rendering prediction of probability of future occurrences difficult. When these incidents occur, they can become extremely disruptive and difficult to control. Assumedly, civil unrest incidents including marches, protests, demonstrations, and gatherings will continue to occur throughout Monroe County."

126.   According to the Hazard Mitigation Plan, peaceful protests and demonstrations are discouraged because of the perceived negative impacts on property resources, real estate and the economy; again, this is a result of the COUNTY and BAXTER falsely conflating "peaceful demonstrations" and peaceful protests with "acts of violence."

127.   Upon information and belief, BAXTER does not provide any training to Sheriff's Deputies on how to encourage and support individuals engaging in "peaceful demonstrations" to ensure that their constitutional rights are not violated by law enforcement officers.

128.   Upon information and belief, BAXTER does not provide any training to Sheriff's Deputies on making a meaningful distinction between how Sheriff's Deputies are trained and

instructed on policing "peaceful demonstrations", "peaceful protests" versus "violent mobs" and riots.

129.     Instead, the COUNTY, in its Hazard Mitigation Plan, states that, "[m]any protests intended to be peaceful demonstrations to the public and the government can escalate into general chaos." Thus, upon information and belief, BAXTER trains his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would a violent mob.

130.     Like the RPD, upon information and belief, BAXTER trains Sheriff's Deputies exclusively on deterring, dispersing, and demoralizing protests and peaceful demonstrations.

131.     In June 2020, several Monroe County Legislators called on BAXTER to implement new protest training to ensure the safety of protesters at Black Lives Matter demonstrations. The legislators drafted a letter to County Executive Adam Bello and BAXTER in which they made a number of requests related to public safety and the safety of protesters, and closed by stating, "Once again, we believe the safety of both protesters, motorists, and law enforcement is of the utmost importance. Right here in Monroe County and across the Nation, we have seen the negative results when leaders are reactionary rather than proactive. Please be sure that a plan is in place to ensure the mutual safety of all involved."

132.     BAXTER claimed the letter was a "political stunt" and refused to provide any specific details regarding how Sheriff's Deputies would ensure the safety of protesters during peaceful demonstrations.

133.     Moreover, upon information and belief, the COUNTY and BAXTER's crowd control training instructed that:

- Not all protestors standing with their hands raised were peaceful;

- that children and the elderly were pawns and shields,

- that volunteers distributing water on a hot day were fomenting violence, and that

- protestors wearing protective gear for fear of RPD and other law enforcement using force against them were "not actually nonviolent," so officers needed to be "mentally prepared to use force" against them.

134.    The COUNTY and BAXTER's directives and instructions for its Sheriff's Deputies to collectively punish nonviolent demonstrators, even though using the force they had been trained to use, was palpably excessive.

135.    As to discipline, even though the Sheriff's Deputies' video-recorded conduct was clearly improper, there have been no reports by Sheriff's Deputies of excessive force by others during the protests, no disciplinary actions or criminal charges for excessive force, and no efforts to relieve violent Sheriff's Deputies from duty or to remove them from any of the special protest response teams.

136.    In summary, upon information and belief, the COUNTY and BAXTER's exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests, demonstrates the COUNTY'S unlawful policies and BAXTER's negligence in failing to train and supervise Sheriff's Deputies in properly and lawfully policing protests to ensure that protesters' rights under the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights are not violated.

137.    As a result of the County's unlawful policies and practices, Plaintiffs were injured and harmed, as described herein.

138.    As a result of the Baxter's negligence, Plaintiffs were injured and harmed, as described herein.

### D. Experiences of the Individual Plaintiffs

#### a. Brendan Boehner (he / him)

139.    On May 30, 2020, Brendan Boehner attended the peaceful protest at the PSB in his capacity as a legal observer with National Lawyers Guild Rochester, Inc. As a legal observer, Mr. Boehner was not participating in the protest, but was present to observe and document the actions of law enforcement. Mr. Boehner and other legal observers were wearing bright green "NLG" hats that clearly indicated they were Legal Observers.

140.    At approximately 4:45 p.m.., in the vicinity of the parking lot to the south of the PSB, while standing alone observing and documenting the actions of law enforcement personnel in a notepad, one or more defendant RPD officers and/or Sheriff's Deputies targeted and shot Mr. Boehner with pepper balls, without cause or legal justification.

141.    Upon information and belief, RPD officers and/or Sheriff's Deputies targeted and shot Mr. Boehner with pepper balls in retaliation for him observing and documenting their actions.

142.    As a result of the May 30, 2020 incident, Mr. Boehner sustained irritation to his skin, eyes, mouth, nose and lungs from exposure to chemical weapons, and pain and bruising from being shot with projectiles.

143.    On the night of September 5, 2020 – September 6, 2020, between approximately 11:30 p.m. and 12:30 a.m., while volunteering in his capacity as an NLG legal observer, in the vicinity of the intersection of Court Street and Clinton Avenue, Mr. Boehner was targeted by law enforcement and subjected to a large amount of tear gas and flash bangs.

144.    Upon information and belief, RPD officers and/or Sheriff's Deputies targeted Mr. Boehner in retaliation for him observing and documenting their actions.

145.    As a result of Defendants' unlawful actions, Mr. Boehner suffered sustained irritation to his eyes, mouth, nose, and lungs, and skin from the various chemical weapons. Exposure to the chemical weapons also caused him to experience flu symptoms for several days.

146.    At no time on any of the above mentioned days did Mr. Boehner commit any act that could have reasonably been interpreted by Defendants as providing them with reasonable or probable cause to believe that he was committing a crime or violation, or that they had lawful justification to use any force against him whatsoever.

### b.  Alanaleilani Connolly (she / her)

147.    On May 30, 2020, from approximately 3:00 p.m. to 6:00 p.m., Ms. Connolly was present at the peaceful protest in the vicinity of the PSB.

148.    When Ms. Connolly arrived, Defendants had closed Exchange Blvd. in the vicinity of PSB to vehicular traffic.

149.    Ms. Connolly was present on the sidewalk in front of the PSB, chanting and singing with other protesters; at no time did she commit any crime or violation.

150.    Nevertheless, RPD officers and/or Sheriff's Deputies sprayed Ms. Connolly and others with tear gas and/or pepper spray, without cause or lawful justification.

151.    Thereafter, RPD officers and/or Sheriff's Deputies physically pushed Ms. Connolly and others from the sidewalk into the street. Ms. Connolly then kneeled with others in front of the law enforcement officers and put their hands up in the air.

152.    As Ms. Connolly was kneeling in front of the RPD officers and/or Sheriff's Deputies with her hands in the air, Defendants attacked her and other protesters with tear gas and/or pepper spray, without cause or legal justification.

153.    Thereafter, RPD officers and Sheriff's Deputies formed a line in front of the protesters, while holding their police batons in an aggressive and intimidating manner.

154.    The RPD officers and Sheriff's Deputies then advanced towards the protesters and shoved them with the batons.

155.    An RPD Officer and/or Sheriff's Deputy struck Ms. Connolly with his baton in her waist, without cause or legal justification.

156.    Immediately thereafter, a different RPD Officer and/or Sheriff's Deputy grabbed Ms. Connolly's breast with his hand, without cause or legal justification.

157.    Ms. Connolly sustained irritation to her skin, eyes, mouth, nose and lungs from exposure to chemical weapons. Ms. Connolly also sustained pain and bruising from being shoved and pushed with a baton; and pain and bruising, and humiliation and invasion of her personal privacy, and was sexually assaulted when an officer grabbed her breast. As a result of the chemical weapons Defendants used against her on May 30, 2020, Ms. Connolly sustained irritation to her skin, eyes, mouth, nose and lungs and menstrual irregularities.

158.    On September 5, 2020, at approximately 10:30 p.m. Ms. Connolly attended the peaceful protest in the vicinity of Broad Street and Exchange Blvd. Defendants guided Ms. Connolly and other protesters to that intersection, where they had erected barricades and closed the streets in the vicinity of Broad Street and Exchange Blvd. to vehicular traffic.

159.    Ms. Connolly was standing in the crowd simply chanting and singing with other protesters and was not committing any crime or violation, when suddenly she was shot with pepper balls numerous times, without cause or legal justification. She was also subjected to large amounts of tear gas and/or pepper spray.

160.     Thereafter, after retreating to the vicinity of Main Street and Exchange Street, Ms. Connolly was shot in the face with a pepper ball by RPD Officers and/or Sheriff's Deputies without cause or legal justification, causing her protective eyewear to break, and causing chemical burns to her face. Ms. Connolly was also subjected to a large amount of tear gas and other chemical weapons. At the time, Ms. Connolly was not doing anything that a reasonable officer could have believed provided them with reasonable or probable cause that she was committing any crime or violation, or that they had a lawful basis to use any force against her.

161.     On September 12, 2020, at approximately 10:00 p.m. to 11:45 p.m., Ms. Connolly marched with other protesters from MLK Park to the vicinity of Child Street and Wilder Streets, where Defendants had closed the streets to vehicular traffic. When they arrived, Ms. Connolly and others were stopped in the street by Defendants, who had set up barriers and would not permit them to march any further.

162.     Ms. Connolly sang, chanted and danced with other protesters, and never committed a crime or violation, or did anything that a reasonable officer could have believed provided them with justification to use any force against her.

163.     Nevertheless, RPD Officers and Sheriff's Deputies suddenly attacked Ms. Connolly and other protesters with pepper balls and other chemical weapons. Thereafter, RPD Officers and Sheriff's Deputies rushed at Ms. Connolly and other protesters and pushed and struck them with batons.

164.     As a result of the chemical weapons Defendants used against her on September 5 and 12, 2020, Ms. Connolly sustained irritation to her skin, eyes, mouth, nose and lungs and other serious injuries, including menstrual irregularities.

     c.     **Carolyn Delvecchio Hoffman (she / her)**

165.    On May 30, 2020, Carolyn Delvecchio Hoffman attended the peaceful protest in the vicinity of PSB.

166.    When she arrived at approximately 5:30 p.m., Ms. Delvecchio Hoffman joined the crowd and peacefully chanted and sang. In response, she was immediately subjected to large amounts of tear gas and/or pepper spray, without cause or justification.

167.    Thereafter, RPD officers and/or Sheriff's Deputies physically pushed Ms. Delvecchio Hoffman north on Exchange Blvd. towards the Court Street Bridge. While she was complying with the orders of law enforcement to move along, Ms. Delvecchio Hoffman was shot in the right lower extremity with a projectile, without cause or legal justification.

168.    As a result of the chemical weapons Defendants used against her on May 30, 2020, Ms. Delvecchio Hoffman sustained irritation to her skin, eyes, mouth, nose and lungs, pain from being shot with a projectile, and menstrual irregularities.

169.    At no time on May 30, 2020 did Ms. Delvecchio Hoffman commit any crime or violation, or do any act that a reasonable officer would have believed justified any use of force against her whatsoever.

170.    On the night of Thursday September 3, 2020 to September 4, 2020, Ms. Delvecchio Hoffman attended the peaceful protest in the vicinity of the PSB. At approximately 11:45 p.m., RPD officers and/or Sheriff's Deputies physically pushed Ms. Delvecchio Hoffman from the vicinity of the sidewalk in front of the PSB to the south on Exchange Blvd. in the vicinity of the Center City Bridge. Between approximately 12:00 a.m. and 1:13 a.m., while peacefully protesting, chanting and singing in the vicinity of Exchange Street and Fitzhugh Street, RPD officers and/or Sheriff's Deputies shot Ms. Delvecchio Hoffman with pepper balls, sprayed her with pepper spray and subjected her to other chemical weapons, without cause or legal justification.

171.   At no time on the night of Thursday September 3, 2020 to September 4, 2020 did Ms. Delvecchio Hoffman commit any crime or violation, or do any act that a reasonable officer would have believed justified any use of force against her whatsoever.

172.   On the night of Friday September 4, 2020 to September 5, 2020, Ms. Delvecchio Hoffman attended the peaceful protest in downtown Rochester. RPD officers and/or Sheriff's Deputies led Ms. Delvecchio Hoffman and hundreds of other peaceful protesters onto the Court Street Bridge, where they were kettled and trapped by RPD officers and/or Sheriff's Deputies, who had erected barricades and would not permit them to move any further.

173.   After RPD officers and/or Sheriff's Deputies had kettled and trapped Ms. Delvecchio Hoffman and hundreds of other protesters on the bridge, they issued a dispersal order. Suddenly, without giving the protesters the time or opportunity to disperse—*and knowing it was physically impossible for them to comply with the dispersal orders*—law enforcement officers began violently attacking protesters. In fact, the RPD officers and/or Sheriff's Deputies began indiscriminately firing pepper balls into the crowd less than 30 seconds after the first "dispersal" order was issued at approximately 10:43 p.m.

174.   Ms. Delvecchio Hoffman was trapped on the Court Street Bridge and shot numerous times with pepper balls by the RPD officers and/or Sheriff's Deputies, and subjected to large amounts of tear gas and other chemical weapons, without cause or legal justification.

175.   Ms. Delvecchio Hoffman was forced off the bridge by the overwhelming force and chemical weapons used by the RPD officers and Sheriff's Deputies against protesters.

176.   Thereafter, after being pushed off the bridge, at approximately 12:28 a.m., in the vicinity of Court Street and St. Mary's Place, Ms. Delvecchio Hoffman was attacked by RPD officers and/or Sheriff's Deputies with tear gas.

177.    At no time on the night of Friday September 4, 2020 to September 5, 2020 did Ms. Delvecchio Hoffman commit any crime or violation, or do any act that a reasonable officer would have believed justified any use of force against her whatsoever.

178.    On the night of Saturday September 5, 2020, Ms. Delvecchio Hoffman attended the peaceful protest in downtown Rochester. She marched with other protesters to the vicinity of the intersection of Broad Street and Exchange Blvd., where she was kettled and trapped by law enforcement who had erected barricades at the intersection and refused to permit Ms. Delvecchio Hoffman and the other protesters to proceed any further. After several minutes of peacefully chanting and protesting, RPD officers and/or Sheriff's Deputies suddenly attacked Ms. Delvecchio Hoffman with chemical weapons, including tear gas and pepper balls, and flash bangs, without cause or legal justification.

179.    At no time on the night of Saturday September 5, 2020 to September 6, 2020 did Ms. Delvecchio Hoffman commit any crime or violation, or do any act that a reasonable officer would have believed justified any use of force against her whatsoever.

180.    As a result of the chemical weapons Defendants used against her on September 3 - 5, 2020, Ms. Delvecchio Hoffman sustained irritation to her skin, eyes, mouth, nose and lungs and other serious injuries, including menstrual irregularities.

### d.  **Rebecca Goldfeder (she / her)**

181.    On May 30, 2020, Rebecca Goldfeder attended the peaceful protest in the vicinity of PSB. At approximately 5:00 p.m., while peacefully protesting, chanting and singing in the vicinity of the sidewalk on Exchange Boulevard, to the South of the PSB, RPD officers and/or Sheriff's Deputies shot Ms. Goldfeder with pepper balls in her legs and body at least six times. She was also subjected to large amounts of tear gas and/or pepper spray.

182.    At no time on May 30, 2020 did Ms. Goldfeder commit any crime or violation, or do any act that a reasonable officer would have believed justified any use of force against her whatsoever.

183.    As a result of the chemical weapons Defendants used against her on May 30, 2020, Ms. Goldfeder sustained irritation to her skin, eyes, mouth, nose and menstrual irregularities.

184.    On Wednesday September 2, 2020, Ms. Goldfeder attended the peaceful protest in the vicinity of Exchange Blvd. in front of the PSB. When she arrived, Ms. Goldfeder peacefully sang and chanted with the group of other protesters, and was immediately attacked by RPD officers and/or Sheriff's Deputies with large amounts of chemical weapons, without cause or legal justification.

185.    At no time on September 2, 2020 did Ms. Goldfeder commit any crime or violation, or do any act that a reasonable officer would have believed justified any use of force against her whatsoever.

186.    On Thursday September 3, 2020, Ms. Goldfeder attended the peaceful protest in the vicinity of Exchange Bld. in the vicinity of the PSB. While standing on the sidewalk in the front of the PSB, at approximately 10:30 p.m., without warning, RPD officers and/or Sheriff's Deputies suddenly began shooting pepper balls into the crowd indiscriminately, and Ms. Goldfeder was hit in the body several times, without cause or legal justification.

187.    At no time on September 3, 2020 did Ms. Goldfeder commit any crime or violation, or do any act that a reasonable officer would have believed justified any use of force against her whatsoever.

188.    On the night of Friday, September 4, 2020 to September 5, 2020, Ms. Goldfeder attended the peaceful protest in downtown Rochester. Police officers and Sheriff's Deputies

allowed Ms. Goldfeder and hundreds of other protesters onto the Court Street bridge, until the group stopped marching when she was in front of Dinosaur BBQ. Suddenly, without warning, at approximately 10:30 p.m., Ms. Goldfeder was present on the Court Street Bridge, near Dinosaur BBQ when she was shot with several pepper balls by RPD officers and/or Sheriff's deputies.

189.   Thereafter, at approximately midnight, Ms. Goldfeder was subjected to a large amount of tear gas and/or other chemical weapons and was shot with approximately four pepper balls in the vicinity of the Bausch & Lomb building and the library, without cause or legal justification, by RPD officers and/or Sheriff's Deputies.

190.   At no time on the night of September 4–5, 2020 did Ms. Goldfeder commit any crime or violation, or do any act that a reasonable officer could have believed justified any use of force against her whatsoever.

191.   On the night of Saturday, September 5, 2020 to September 6, 2020, Ms. Goldfeder attended the peaceful protest in downtown Rochester. At approximately 10:30 p.m., Ms. Goldfeder joined the group of protesters on State Street north of Main Street; at the time, RPD officers and Sheriff's Deputies were forcibly moving the protest group north on State Street. Officers rushed at protesters and pushed them and struck them, shot them with pepper balls, and attacked them with other chemical weapons and flash bangs. Ms. Goldfeder was shot with numerous pepper balls and subjected to large amounts of tear gas, without cause or legal justification. Upon information and belief, RPD officers and Sheriff's Deputies harmed Ms. Goldfeder

192.   At no time on the night of September 5, 2020 to September 6, 2020 did Ms. Goldfeder commit any crime or violation, or do any act that a reasonable officer could have believed justified any use of force against her whatsoever.

193.     As a result of the chemical weapons Defendants used against her on May 30 and September 2 – 5, 2020, Ms. Goldfeder sustained irritation to her skin, eyes, mouth, nose and lungs and other serious injuries, including menstrual irregularities.

### e.  Solomon Gominiak (they / them)

194.     Solomon Gominiak attended the peaceful protest on May 30, 2020 in the vicinity of PSB. Throughout the protest, Mx.. Gominiak was subjected to large amounts of tear gas. At approximately 4:30 p.m., while standing on the sidewalk on Exchange Boulevard in the front of PSB, Mx. Gominiak was shot in the chest and legs with pepper balls, without cause or justification; at the time they were shot, Mx. Gominiak was peacefully chanting and protesting and not doing anything a reasonable police officer could have believed constituted a crime or violation, or justified the use of any force.

195.     At no time on May 30, 202 did Mx. Gominiak commit any crime or violation, or do any act that a reasonable officer could have believed justified any use of force against him whatsoever.

196.     Mx. Gominiak sustained irritation to his skin, eyes, mouth, nose and lungs from exposure to chemical weapons. Mr. Gominiak also sustained pain and bruising from being shot with projectiles.

### f.  Ryan "Rylea" Howe (they / them)

197.     Rylea Howe attended the peaceful protest on May 30, 2020 in the vicinity of PSB. Throughout the protest, Mx. Howe was subjected to large amounts of tear gas.

198.     At approximately 4:00 p.m., in the front of PSB, an RPD officer and/or Sheriff's Deputy threw a tear gas cannister at Mx. Howe, which came to rest by his feet; this caused him to inhale a large amount of chemicals. Thereafter, Mx. Howe was targeted and shot  approximately

10-20 times in the face and body with pepper balls, without cause or legal justification, Mx. Howe was using their body as a shield protect Black protesters from being shot at close range by RPD officers and/or Sheriff's Deputies with pepper balls.

199.     As a result of the May 30, 2020 incident, Mx. Howe sustained severe physical pain, welts, bruising throughout his face and entire body from being shot with pepper balls; a split-opened lip; two black eyes; and irritation to their eyes, mouth, nose, and lungs, and skin from the various chemical weapons. Exposure to the chemical weapons also caused Mx. Howe to experience flu-like symptoms for several days.

200.     At no time on May 30, 202 did Mr. Gominiak commit any crime or violation, or do any act that a reasonable officer could have believed justified any use of force against him whatsoever.

201.     On Wednesday September 2, 2020, Mx. Howe attended the peaceful protest in the vicinity of Exchange Blvd. in front of the PSB. Mx. Howe was subjected to large amounts of chemical weapons. Mx. Howe was shot with pepper balls, unlawfully stopped, seized, assaulted, battered, falsely arrested, and maliciously prosecuted by ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE, without cause or justification.

202.     On Wednesday September 2, 2020, at approximately 2:45 p.m., ARCHETKO, KIRK, HOGG and approached Mx. Howe, violently seized them and threw them to the ground. As they approached, ANZALONE fired approximately 20 pepper balls at Mx. HOWE, engulfing Mx. HOWE in a cloud of chemicals. CELENTANO pepper sprayed Mx. HOWE directly in the face from point-blank range. ARCHETKO, KIRK and TURNER then dragged Mx. HOWE behind the barricades, and ARCHETKO slammed Mx. HOWE's face and body into the ground. CELENTANO and ARCHETKO placed their knees on Mx. HOWE's back and applied their full

bodyweight on Mx. HOWE's back. KIRK then struck Mx. HOWE in the head by his right ear. ARCHETKO then placed handcuffs on Mx. HOWE's wrists in an unreasonably tight manner.  All the force used against Mx. HOWE was unreasonable and done without cause or legal justification.

203.    Mx. Howe was handcuffed and arrested, dragged into PSB. ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE falsified their account of their interaction with Mx. HOWE in official police paperwork, which was forwarded to the district attorney's office to initiate Mx. HOWE's prosecution. All the false criminal charges were dismissed by Judge Stephen Miller their entirety on November 2, 2020 because the officer's allegations in the accusatory instrument failed to establish that Mx. Howe had committed any crime.

204.    ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE lacked reasonable or probable cause to arrest Mx. HOWE or charge them with any crime or violation. At no time did Mx. HOWE commit a crime or violation, and no reasonable officer would have believed under the circumstances that they had probable cause or any legal justification to arrest Mx. HOWE or use any force against them, let alone the grossly excessive and unreasonable amount of force used by ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE.

205.    On the night of Saturday, September 5, 2020 to September 6, 2020, Mx. Howe attended the peaceful protest in downtown Rochester. At approximately 10:30 p.m., Mx. Howe was present at the intersection of Exchange Blvd. and Broad Street, close to the barricades where RPD officers and Sheriff's Deputies had blocked off the street and kettled and trapped the protesters. When RPD officers announced dispersal orders, it was physically impossible to comply because there were thousands of protesters behind them. At no time did Mx. Howe commit any

act that a reasonable police officer could have believed constituted a crime or violation; Mx. Howe was peacefully chanting and singing with other protesters, when suddenly, RPD officers and Sheriff's Deputies attacked Mx. Howe and other protesters with large amounts of chemical weapons, including tear gas and pepper balls; flash bangs; and other "less lethal" weapons, without cause or legal justification. Mx. Howe was struck with a baton and shot in the forehead with a pepper ball, and subjected to large amounts of chemical weapons.

206.    As a result of the chemical weapons Defendants used against them on September 2 and 5, 2020, Mx. Howe sustained irritation to their skin, eyes, mouth, nose and lungs, and had flu-like symptoms for several days.

### g.  Nicole Lindquist (she / her)

207.    On May 30, 2020, Nicole Lindquist attended the peaceful protest on May 30, 2020 in the vicinity of PSB. Ms. Lindquist arrived at approximately 3:30 p.m. and sang and chanted with the group in the vicinity of the front of the PSB. Without cause or provocation, RPD officers and/or Sheriff's Deputies pushed Ms. Lindquist from the sidewalk into the street. Shortly thereafter, RPD officers and/or Sheriff's Deputies threw a tear gas cannister at Ms. Lindquist, which hit in the left leg and then deployed and engulfed her in tear gas. Thereafter, after Ms. Lindquist turned to retreat and was walking away, RPD officers and/or Sheriff's Deputies shot her multiple times in the back with pepper balls.

208.    At no time on May 30, 2020 did Ms. Lindquist commit any act that a reasonable police officer could have believed constituted a crime or violation

209.    As a result of the chemical weapons Defendants used against her on May 30, 2020, Ms. Lindquist sustained irritation to her skin, eyes, mouth, nose and lungs and other serious injuries.

210.     On the night of Friday, September 4, 2020 to September 5, 2020, Ms. Lindquist marched onto the Court Street Bridge with hundreds of other protesters and was attacked by the RPD officers and/or Sheriff's Deputies. At approximately 10:30 p.m., while on the Court Street Bridge, when the RPD issued dispersal orders knowing that it was physically impossible for Ms. Lindquist and other protesters to immediately comply, Ms. Lindquist was standing towards the front of the group, closest to the police line. Approximately 30 seconds after the first dispersal order, Ms. Lindquist was attacked by large amounts of chemical weapons and pepper balls. When the RPD officers and/or Sheriff's Deputies began shooting pepper balls, Ms. Lindquist had her hands above her head and she was shot in the hand, causing her to sustain a broken finger. She was also shot with pepper balls twice in the back of the head.

211.     Immediately thereafter, RPD officers and Sheriff's Deputies deconstructed the metal barricades and rushed at Ms. Lindquist and other protesters; an RPD officer and/or Sheriff's Deputy physically seized Ms. Lindquist, ripped her umbrella out of her hand, and pushed her to the ground. Thereafter, Ms. Lindquist got up and began walking backwards to retreat, and an RPD officer and/or Sheriff's Deputy struck her multiple times with a baton while she was attempting to comply with the officers' orders to "move back"— at the time, there were hundreds of other protesters behind her slowly retreating off the bridge, and she had nowhere to go.

212.     Thereafter, after Ms. Lindquist was pushed off the bridge, in the vicinity of Chestnut Street and Court Street, she was attacked with large amounts of tear gas. At the time, she was simply standing and chanting with the group of protesters, not committing any crime or violation.

213.     At no time on the night of September 4 – 5, 2020 did Ms. Lindquist commit any act that a reasonable police officer could have believed constituted a crime or violation

214.    As a result of the September 4 – 5, 2020 incident, Ms. Lindquist sustained irritation to her skin, eyes, mouth, nose, and lungs from exposure to chemical weapons. Ms. Lindquist also sustained pain and bruising from being shot with pepper balls and projectiles, struck with batons, and a broken finger.

###    h.   Susanna Moore (she / they)

215.    On May 30, 2020, Susanna Moore attended the peaceful protest in the vicinity of PSB. Throughout the protest, Ms. Moore was subjected to large amounts of tear gas, without cause or justification. At approximately 4:00 p.m., while Ms. Moore was standing on the sidewalk by the flagpoles in front of the PSB, peacefully chanting and not committing any crime or violation, an RPD officer and/or Sheriff's Deputy shot her with pepper balls, without cause or justification.

216.    At no time on May 30, 2020 did Ms. Moore commit any act that a reasonable police officer could have believed constituted a crime or violation

217.    As a result of the chemical weapons Defendants used against her on May 30, 2020, Ms. Moore sustained irritation to her skin, eyes, mouth, nose and lungs and other serious injuries.

218.    On Thursday September 3–4, 2020, Ms. Moore attended the peaceful protest in the vicinity of Exchange Bld. in front of the PSB. At approximately 10:30 p.m., Ms. Moore was standing on the sidewalk in front of the PSB, peacefully chanting and protesting, and not committing any crime or violation. Suddenly, without warning, RPD officers and/or Sheriff's Deputies began indiscriminately firing hundreds of rounds of pepper balls into the crowd; Ms. Moore immediately retreated, and while retreating to the other side of Exchange Boulevard, she was shot in the face and legs with pepper balls.

219.    At no time on the night of September 3–4, 2020 did Ms. Moore commit any act that a reasonable police officer could have believed constituted a crime or violation.

220.     On the night of Friday, September 4, 2020 to September 5, 2020, Ms. Moore attended the peaceful protest in downtown Rochester. At approximately 10:30 p.m., Ms. Moore was present on the Court Street Bridge, when she was attacked by RPD officers and/or Sheriff's Deputies with large amounts of chemical weapons; and then pushed by officers after they rushed through the barricades. Thereafter, at approximately 11:30 p.m. to 12:00 a.m., Ms. Moore was attacked by RPD officers and/or Sheriff's Deputies in the vicinity of the intersection of Chestnut Street and Court Street, who shot her with pepper balls and tear gas, without cause or legal justification.

221.     At no time on the night of September 4–5, 2020 did Ms. Moore commit any act that a reasonable police officer could have believed constituted a crime or violation; or justified the force used against her.

222.     On the night of Saturday, September 5, 2020 to September 6, 2020, Ms. Moore attended the peaceful protest in downtown Rochester. At approximately 10:30 p.m., Ms. Moore was kettled and trapped by RPD officers and/or Sheriff's Deputies at the intersection of Exchange Boulevard and Broad Street, where law enforcement had erected barricades and would not permit Ms. Moore and the thousands of other protesters to proceed any further. After she was trapped at the intersection, Ms. Moore peacefully protested with the group, singing and chanting, until suddenly at approximately 10:40 p.m., RPD officers and/or Sheriff's Deputies attacked her with a large amount of chemical weapons, including tear gas and chemicals from pepper balls, without cause or legal justification.

223.     At no time on the night of September 5–6, 2020 did Ms. Moore commit any act that a reasonable police officer could have believed constituted a crime or violation.

224.    As a result of the chemical weapons Defendants used against her on September 3 – 5, 2020, Ms. Moore sustained irritation to her skin, eyes, mouth, nose and lungs and other serious injuries, including menstrual irregularities.

### i.    Ryan Mullaney (he / him)

225.    On May 30, 2020, Ryan Mullaney attended the peaceful protest in the vicinity of the PSB in his capacity as a legal observer with National Lawyer's Guild Rochester, Inc. Mr. Mullaney and other legal observers were wearing bright green "NLG" hats that clearly indicated they were Legal Observers. As a legal observer, Mr. Mullaney was not participating in the protest, but was present to observe and document the actions of law enforcement. At approximately 4:00 p.m. to 5:00 p.m., while Mr. Mullaney was on the sidewalk on Exchange Street in front of the Public Safety Building, to the south of the courtyard, when RPD officers and/or Sheriff's Deputies targeted him and shot him with a projectile as he was attempting to document law enforcement activities.

226.    As a result of the May 30, 2020 incident, Mr. Mullaney sustained irritation to his skin, eyes, mouth, nose and lungs from exposure to chemical weapons, and pain and bruising from being shot with a projectile.

227.    At no time on the night of May 30, 2020 did Mr. Mullaney commit any act that a reasonable police officer could have believed constituted a crime or violation. Instead, RPD officers and/or Sheriff's Deputies specifically targeted Mr. Mullaney because he was documenting their activities in his capacity as an NLG Legal Observer.

228.    On the night of Friday, September 4, 2020 to September 5, 2020, Mr. Mullaney attended the peaceful protest in downtown Rochester in his capacity as an NLG Legal Observer. As a legal observer, Mr. Mullaney was not participating in the protest, but was present to observe

and document the actions of law enforcement and was wearing a bright green "NLG" hat to clearly indicate that he was acting in his capacity as a Legal Observer. Throughout the night, RPD officers and/or Sheriff's Deputies targeted Mr. Mullaney and attacked him with chemical weapons; at approximately 12:00 a.m. in the vicinity of Court Street and Chestnut Street, RPD officers and/or Sheriff's Deputies targeted Mr. Mullaney and attacked him with chemical weapons.

229.    At no time on the night of September 4, 2020 to September 5, 2020 did Mr. Mullaney commit any act that a reasonable police officer could have believed constituted a crime or violation. Instead, RPD officers and/or Sheriff's Deputies specifically targeted Mr. Mullaney because he was documenting their activities in his capacity as an NLG Legal Observer.

230.    On the night of Saturday, September 5, 2020 to September 6, 2020, Mr. Mullaney attended the peaceful protest in downtown Rochester in his capacity as an NLG Legal Observer. At approximately 10:40 p.m., after RPD officers and Sheriff's Deputies had kettled and trapped the group in the vicinity of the intersection of Exchange Blvd. and Broad Street, Mr. Mullaney was targeted and subjected to large amounts of chemical weapons and flash bangs. The chemical weapons caused Mr. Mullaney to have blurred vision and the flash bangs disoriented him, and thus the RPD officers and Sheriff's Deputies impaired Mr. Mullaney's ability to observe them and document their activities.

231.    At no time on the night of September 5, 2020 to September 6, 2020 did Mr. Mullaney commit any act that a reasonable police officer could have believed constituted a crime or violation. Instead, RPD officers and/or Sheriff's Deputies specifically targeted Mr. Mullaney because he was documenting their activities in his capacity as an NLG Legal Observer.

232.    On the night of October 13, 2020, Mr. Mullaney attended the peaceful protest in the vicinity of the sidewalk in front of the PSB. At no time on that night did Mr. Mullaney enter

inside of the PSB, but instead arrived after other protesters had been attacked inside of the PBS and pushed outside by RPD officers. As Mr. Mullaney was standing on the sidewalk in front of the PSB at approximately 11:00 p.m., and he was shot numerous times with pepper balls, without legal justification, by RPD officers.

233.    At no time on the night of October 13, 2020 did Mr. Mullaney commit any act that a reasonable police officer could have believed constituted a crime or violation, or justified the use of any force against him.

234.    As a result of the September 4 and 5, 2020 incidents, and the October 13, 2020 incident, Mr. Mullaney sustained irritation to his skin, eyes, mouth, nose and lungs from exposure to chemical weapons, and pain and bruising from being shot with pepper balls.

### j.  Barbara Rivera (she / her)

235.    On May 30, 2020, Barbara Rivera attended the peaceful protest in the vicinity of PSB. Throughout the protest, Ms. Rivera was subjected to large amounts of tear gas. At approximately 5:00 p.m., while Ms. Rivera was standing on the driveway leading to the underground parking garage, peacefully protesting with her hands above her head in the air, RPD officers and/or Sheriff's Deputies shot Ms. Rivera with pepper balls numerous times from close range throughout her body.

236.    At no time on May 30, 2020 did Ms. Rivera commit any act that a reasonable police officer could have believed constituted a crime or violation, or justified the use of any force against her.

237.    As a result of the chemical weapons Defendants used against her on May 30, 2020, Ms. Rivera sustained irritation to her skin, eyes, mouth, nose and lungs and other serious injuries.

238.     On Thursday September 3, 2020, Ms. Rivera attended the peaceful protest in the vicinity of Exchange Bld. in front of the PSB. Ms. Rivera was subjected to large amounts of chemical weapons throughout the night. At approximately 10:30 p.m., while standing on the sidewalk in front of PSB, peacefully protesting and chanting, RPD officers and/or Sheriff's Deputies pepper sprayed directly in the face, without cause or legal justification. Thereafter, police began indiscriminately shooting pepper balls into the crowd and then rushed at the protesters, forcing Ms. Rivera to retreat.

239.     At no time on September 3–4, 2020 did Ms. Rivera commit any act that a reasonable police officer could have believed constituted a crime or violation, or justified the use of any force against her.

240.     On the night of Friday, September 4, 2020 to September 5, 2020, Ms. Rivera attended the peaceful protest in downtown Rochester. Ms. Rivera was towards the front of the crowd, closest to the police barricades, when the RPD officers and/or Sheriff's Deputies kettled and trapped them on the bridge; thus, there were hundreds of other protesters behind her on the bridge. Suddenly, at approximately 10:30 p.m., approximately 30 seconds after the police issued the first dispersal warning, and without giving Ms. Rivera or others the time or opportunity to disperse, RPD officers and/or Sheriff's Deputies attacked Ms. Rivera with large amounts of chemical weapons, including tear gas and pepper balls.

241.     Thereafter, at approximately 11:30 p.m. to 12:00 a.m., Ms. Rivera was shot with multiple pepper balls while in the vicinity of Court Street between Clinton and South Avenue, without cause or legal justification. At the time, Ms. Rivera was simply standing with a group of other protesters, and not committing any crime or violation or doing anything that a reasonable officer could have believed justified using any force against her.

242.    At no time on September 4–5, 2020 did Ms. Rivera commit any act that a reasonable police officer could have believed constituted a crime or violation, or justified the use of any force against her.

243.    On the night of Saturday, September 5, 2020 to September 6, 2020, Ms. Rivera attended the peaceful protest in downtown Rochester. She marched with the group to the intersection of Broad Street and Exchange Blvd., where they were stopped by RPD officers and Sheriff's Deputies who had erected barricades, and kettled and trapped them at that intersection. Ms. Rivera was standing near the front of the crowd and peacefully protesting, and never did anything that could have been interpreted by a reasonable officer as justifying any use of force against her; nevertheless, at approximately 10:40 p.m., Ms. Rivera was attacked by RPD officers and/or Sheriff's Deputies with tear gas, pepper balls and other chemical weapons. RPD officers and/or Sheriff's Deputies also attacked her and other protesters with flash bang grenades, which exploded near Ms. Rivera and damaged her hearing. Shortly thereafter, RPD officers and/or Sheriff's Deputies rushed at Ms. Rivera and the other protesters and physically pushed them.

244.    At no time on September 5–6, 2020 did Ms. Rivera commit any act that a reasonable police officer could have believed constituted a crime or violation, or justified the use of any force against her.

245.    As a result of the chemical weapons Defendants used against her on September 3 – 6, 2020, Ms. Rivera sustained irritation to her skin, eyes, mouth, nose and lungs and other serious injuries, including menstrual irregularities.

### k.   Alyson Trombulak (she / her)

246.    On May 30, 2020, Alyson Trombulak attended the peaceful protest in the vicinity of PSB. At approximately 4:10 p.m. Ms. Trombulak was standing on the sidewalk near the

flagpoles in front of the PSB, peacefully protesting, and not doing anything that a reasonable police officer could have interpreted as a crime or violation or believed provided them with any justification to use any force against her; nevertheless, RPD officers and/or Sheriff's Deputies attacked her with tear gas and other chemical weapons, without cause or justification. Ms. Trombulak peacefully protested in the vicinity of the front of the PSB until approximately 5:30 p.m., and never did anything that a reasonable officer could have believed provided justification for using any force against her; yet, RPD officers and/or Sheriff's Deputies repeatedly attacked her and other protesters with chemical weapons.

247.    At no time on May 30, 2020 did Ms. Trombulak commit any act that a reasonable police officer could have believed constituted a crime or violation, or justified the use of any force against her.

248.    As a result of the chemical weapons Defendants used against her on May 30, 2020, Ms. Trombulak sustained irritation to her skin, eyes, mouth, nose, lungs and vocal cords.

249.    On the night of Friday, September 4, 2020 to September 5, 2020, Ms. Trombulak attended the peaceful protest in downtown Rochester. When the RPD officers and Sheriff's Deputies kettled and trapped Ms. Trombulak and other protesters on the Court Street Bridge and would not permit them to march any further, Ms. Trombulak was trapped at the front line of protesters, closest to the police barricades. Suddenly, approximately 30 second after the police issued the first dispersal order, RPD officers and Sheriff's Deputies attacked Ms. Trombulak with pepper balls and other chemical weapons. Before shooting, the officers knew they had not provided sufficient time for Ms. Trombulak to even attempt to comply with the dispersal order; as a result, Ms. Trombulak was shot approximately ten times with pepper balls from close range.

250.    At no time on September 4, 2020 did Ms. Trombulak commit any act that a reasonable police officer could have believed constituted a crime or violation, or justified the use of any force against her.

251.    On the night of Saturday, September 5, 2020 to September 6, 2020, Ms. Trombulak attended the peaceful protest in downtown Rochester. She marched with the group to the intersection of Broad Street and Exchange Blvd., where they were stopped by RPD officers and Sheriff's Deputies who had erected barricades, and kettled and trapped them at that intersection. Ms. Trombulak was standing near the front of the crowd and peacefully protesting, and never did anything that could have been interpreted by a reasonable officer as justifying any use of force against her; nevertheless, at approximately 10:40 p.m., Ms. Trombulak was attacked by RPD officers and/or Sheriff's Deputies with tear gas, pepper balls and other chemical weapons. While Ms. Trombulak was attempting to protect herself with a makeshift shield, RPD officers and/or Sheriff's Deputies approached her and reached over her shield and pepper sprayed her directly in the face. RPD officers and/or Sheriff's Deputies also attacked her and other protesters with flash bang grenades and rushed at Ms. Trombulak and the other protesters and physically pushed them.

252.    At no time on September 5–6, 2020 did Ms. Trombulak commit any act that a reasonable police officer could have believed constituted a crime or violation, or justified the use of any force against her.

253.    As a result of the chemical weapons Defendants used against her on September 4 – 6, 2020, Ms. Trombulak sustained irritation to her skin, eyes, mouth, nose and lungs and other serious injuries, including menstrual irregularities.

l.    **Betty Wolfanger (she / her)**

254.    On May 30, 2020, Betty WOLFANGER attended the peaceful protest at the PSB. Throughout the protest, Ms. WOLFANGER was subjected to large amounts of tear gas. At approximately 4:00 p.m., while Ms. WOLFANGER was standing in front of PSB, RPD officers and/or Sheriff's Deputies attacked her with chemical weapons and shot her multiple times with pepper balls. At the time, Ms. Wolfanger was not doing anything that a reasonable officer could have interpreted as a crime or violation, or justification for using any force against her whatsoever.

255.    As a result of the chemical weapons Defendants used against her on May 30, 2020, Ms. WOLFANGER sustained irritation to her skin, eyes, mouth, nose and lungs and other serious injuries.

256.    At no time on May 30, 2020 did Ms. WOLFANGER commit any act that a reasonable police officer could have believed constituted a crime or violation, or justified the use of any force against her.

257.    On Thursday September 3, 2020, Ms. WOLFANGER attended the peaceful protest in the vicinity of Exchange Bld. in front of the PSB. Ms. WOLFANGER was subjected to large amounts of chemical weapons throughout the night. At approximately 10:30 p.m., Ms. Wolfanger was standing on the sidewalk in front of the PSB near the flagpoles, about 10 feet back from the metal barricades, when RPD officers and/or Sheriff's Deputies suddenly, without warning, began shooting at Ms. Wolfanger and other protesters with hundreds of pepper balls for no reason. Ms. Wolfanger crouched behind an orange traffic barrel to protect herself, but an RPD officer and/or Sheriff's Deputy approached her and attacked her with chemical weapons from close range— pepper spraying her directly in the face from just inches, without cause or legal justification.

258.    At no time on September 3, 2020 did Ms. WOLFANGER commit any act that a reasonable police officer could have believed constituted a crime or violation, or justified the use of any force against her.

259.    On the night of Friday, September 4, 2020 to September 5, 2020, Ms. WOLFANGER attended the peaceful protest in downtown Rochester. When  RPD officers and Sheriff's Deputies trapped Ms. WOLFANGER and hundreds of other protesters on the Court Street Bridge, she was standing in towards the front of the crowd, and there were hundreds of protesters packed on the bridge behind her. At approximately 10:30 p.m., approximately 30 seconds after the dispersal orders were issued, Ms. WOlfanger was attacked by RPD officers and Sheriff's Deputies with chemical weapons and pepper balls; and then the RPD officers and Sheriff's Deputies rushed at them and physically  pushed them off the bridge.

260.    At no time on September 4, 2020 did Ms. WOLFANGER commit any act that a reasonable police officer could have believed constituted a crime or violation, or justified the use of any force against her.

261.    On the night of Saturday, September 5, 2020 to September 6, 2020, Ms. Wolfanger attended the peaceful protest in downtown Rochester. She marched with the group to the intersection of Broad Street and Exchange Blvd., where they were stopped by RPD officers and Sheriff's Deputies who had erected barricades, and kettled and trapped them at that intersection. Ms. Wolfanger was standing near the front of the crowd and peacefully protesting, and never did anything that could have been interpreted by a reasonable officer as justifying any use of force against her; nevertheless, at approximately 10:40 p.m., Ms. Wolfanger was attacked by RPD officers and/or Sheriff's Deputies with tear gas, pepper balls and other chemical weapons. RPD

officers and/or Sheriff's Deputies also attacked her and other protesters with flash bang grenades and rushed at Ms. Wolfanger and the other protesters and physically pushed them.

262.     At no time on September 5–6, 2020 did Ms. WOLFANGER commit any act that a reasonable police officer could have believed constituted a crime or violation, or justified the use of any force against her.

263.     As a result of the chemical weapons Defendants used against her on September 3 – 6, 2020, Ms. WOLFANGER sustained irritation to her skin, eyes, mouth, nose and lungs and other serious injuries, including menstrual irregularities.

## V.  CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Excessive Force
### *Pursuant to 42 U.S.C. § 1983*
### (Plaintiffs vs. Individual Defendants)

264.     All preceding and subsequent paragraphs are incorporated by reference.

265.     Defendants' actions towards Plaintiffs constitute excessive force in violation of Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983.

266.     Defendants' use of force towards Plaintiffs constitute a Fourth Amendment seizure.

267.     Defendants' use of physical force and deployment of chemical weapons -- including pepper balls, tear gas, and pepper spray –was implemented to achieve the dispersal of protesters and to control their movement. By physically moving certain Plaintiffs and circumscribing the area of movement of other Plaintiffs, Defendants seized Plaintiffs within the meaning of the Fourth Amendment.

268.     Defendants intentionally terminated the Plaintiffs' freedom of movement, which constitutes a Fourth Amendment seizure.

269.    Defendants intentionally used physical force against the Plaintiffs.

270.    Plaintiffs were subjected to physical force, chemical weapons, and less-lethal projectiles without a means of escape or egress.

271.    Defendants used force against Plaintiffs that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them.

272.    The types and levels of force Defendants used against Plaintiffs was in contravention of, or inconsistent with, related RPD and or MCSO policies and/or training.

273.    The types and levels of force Defendants used against Plaintiffs was in contravention of, or inconsistent with, good and accepted police practices.

274.    As a result of the acts and omissions of the RPD officers and/or Sheriff's Deputies, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

275.    Plaintiffs sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

276.    The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## SECOND CLAIM FOR RELIEF

### First Amendment Infringements, Including First Amendment Retaliation
### *Pursuant to 42 U.S.C. § 1983*
### (Plaintiffs vs. All Defendants)

277.    All preceding and subsequent paragraphs are incorporated by reference.

278.    All individuals have a First Amendment right to protest the actions of government officials, including police officers, without fear for their safety.

279.    In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiff of the rights protected by the First Amendment to the United States Constitution.

280.    Defendants (a) retaliated against Plaintiffs for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiffs' free speech rights, including, but not limited to, in falsely arresting Plaintiff HOWE, in subjecting Plaintiffs to excessive force, in selectively enforcing laws and regulations against Plaintiffs, and in otherwise violating Plaintiffs' rights and engaging in the acts and omissions complained of herein.

281.    Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiffs' perceived protected speech and/or conduct.

282.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiffs from continuing to engage in such protected speech and/or conduct.

283.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiffs from engaging in similar protected conduct in the future.

284.    As a result of the foregoing, Plaintiffs suffered injuries and damages.

285.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### THIRD CLAIM FOR RELIEF

**Failure To Intervene**
***Pursuant to 42 U.S.C. § 1983***
**(Plaintiffs vs. Individual Defendants)**

286.    All preceding and subsequent paragraphs are incorporated by reference.

287.     The individual defendants all had an affirmative duty to intervene on Plaintiffs' behalf to prevent the violation of their constitutional rights by the other Defendant RPD officers and/or Sheriff's Deputies.

288.     The individual defendants failed to intervene on Plaintiffs' behalf despite having had realistic opportunities to do so.

289.     The individual defendants failed to intervene on Plaintiffs' behalf despite having substantially contributed to the circumstances within which Plaintiffs' rights were violated by their affirmative conduct.

290.     As a result of the aforementioned conduct of the individual defendants, Plaintiffs' constitutional rights were violated.

291.     As a result, Plaintiffs were damaged, injured and harmed, and seek compensation in an amount to be determined at trial.

292.     Defendant RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

**FOURTH CLAIM FOR RELIEF**
**Assault and Battery**
**(Plaintiffs vs. CITY and Individual Defendants)**

293.     All preceding and subsequent paragraphs are incorporated by reference.

294.     By the aforedescribed conduct, defendants, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered Plaintiffs, when they, in a hostile and/or offensive manner struck Plaintiffs without their consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiffs and caused such battery.

295.   The John Doe RPD Officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

296.   The Defendant CITY, as the employer of the individual John Doe RPD Officers, is responsible for their wrongdoing under the doctrine of respondeat superior.

297.   At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the John Doe RPD Officers and Sheriff's Deputies against Plaintiff.

298.   As a result, Plaintiffs were damaged, harmed and injured, and seek compensation in an amount to be determined at trial.

299.   Defendant RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## FIFTH CLAIM FOR RELIEF
### Negligent Training and Instruction on Policing Protests
### (Plaintiffs vs. BAXTER)

300.   All preceding and subsequent paragraphs are incorporated by reference.

301.   Defendant BAXTER was negligent in the training, supervision and discipline of the Defendant Sheriff's Deputies, as detailed herein.

302.   BAXTER had a duty to ensure that his Sheriff's Deputies were properly trained in policing peaceful protests and demonstrations, to keep the participants safe and to promote First Amendment expression.

303.   BAXTER knew or should have known that the Hazard Mitigation Plan conflated peaceful protests and demonstrations with violent mobs and riots, and that in the absence of proper training, his Sheriff's Deputies would use unreasonable and excessive force against peaceful protesters.

304.    BAXTER knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities and infertility.

305.    BAXTER breached his duty to keep demonstrators safe by, among other things, training his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would police violent mobs and/or riots.

306.    BAXTER breached his duty to keep demonstrators safe by, among other things, training his Sheriff's Deputies to use chemical weapons indiscriminately against protesters.

307.    BAXTER breached his duty to keep demonstrators safe by, among other things, failing to train his Sheriff's Deputies on their duty to intervene to prevent the violation of protesters rights by other Sheriff's Deputies, RPD officers and/or other law enforcement officials.

308.    BAXTER breached his duty to keep demonstrators safe by, among other things, training his Sheriff's Deputies to that they could shoot pepper balls and other "less-than-lethal" projectiles at protesters' heads.

309.    BAXTER breached his duty to keep demonstrators safe by, among other things, training Sheriff's Deputies to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

310.    BAXTER breached his duty to keep demonstrators safe by all other actions detailed herein.

311.    Plaintiffs' injuries were a direct and proximate result BAXTER negligently training and/or failing to train his deputies in how to lawfully police First Amendment activities.

312. Moreover, despite their use of extreme and excessive violence against protesters on May 30, 2020 and September 2-October 13, 2020, BAXTER was negligent in failing to supervise or discipline any of his Sheriff's Deputies related to any force used protesters on those nights prior to Plaintiff's injury. BAXTER's negligence was the direct and proximate cause of Plaintiff's injuries, including menstrual irregularities.

313. As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York

314. Moreover, despite their use of extreme and excessive violence against protesters, BAXTER was negligent failing to supervise or discipline any of his Sheriff's Deputies related to any force used against Plaintiffs or any other protesters. BAXTER's negligence was the direct and proximate cause of Plaintiffs' injuries.

<u>SIXTH CLAIM FOR RELIEF</u>
**Negligence**
**(Plaintiffs vs. Individual Defendants)**

315. All preceding and subsequent paragraphs are incorporated by reference.

316. The Defendant RPD officers and Sheriff's Deputies, their agents, servants, employees, officers and deputies were negligent using the "less lethal" military grade weapons and chemical weapons against Plaintiffs, which was the direct and proximate cause of Plaintiffs' injuries.

317. The Defendant RPD officers and Sheriff's Deputies had a duty to permit the Plaintiffs to peacefully protest and not harm them.

318. Defendants breached their duty by negligently harming Plaintiffs, including by their indiscriminate use of military-grade chemical weapons.

319.     Defendants breached their duty to Plaintiffs by using indiscriminate force against "groups" of protesters, and not making any individualized determinations that they had cause or justification to use any force against any individual Plaintiff.

320.     Defendants' negligence was the direct and proximate cause of Plaintiffs' harms and damages, as described herein.

321.     At no point during the incidents described herein did the circumstances necessitate or support the above applications of indiscriminate force utilized by the John Doe RPD Officers and Sheriff's Deputies against Plaintiff.

322.     As a result, Plaintiffs were damaged, harmed and injured, and seek compensation in an amount to be determined at trial.

323.     Defendant RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

### SEVENTH CLAIM FOR RELIEF
**False Arrest**
*Pursuant to New York State Law*
**(HOWE vs. CITY, ARCHETKO, CELENTANO, KIRK, HOGG, TURNE and ANZALONE)**

324.     All preceding and subsequent paragraphs are incorporated by reference.

325.     One or more of the defendant RPD officers handcuffed and arrested Plaintiff.

326.     The arrest was made in the absence of a warrant for the arrest.

327.     The arrest was made in the absence of probable cause for the arrest.

328.     The defendant RPD officers arrested plaintiff without having exigent circumstances for doing so.

329.     There was no other authority for the arrest of plaintiff.

330.     Plaintiff was conscious of the arrest.

331.    Plaintiff did not consent to the arrest.

332.    The defendant RPD officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant City and the RPD, which are therefore responsible for their conduct.

333.    The Defendant City, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

334.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**EIGHTH CLAIM FOR RELIEF**
**Unlawful Seizure / False Arrest**
*Pursuant to 42 U.S.C. § 1983*
**(HOWE vs. ARCHETKO, CELENTANO, KIRK, HOGG, TURNE and ANZALONE)**

335.    All preceding and subsequent paragraphs are incorporated by reference.

336.    ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE had no judicial warrant authorizing them to seize Mx. HOWE.

337.    ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE seized Mx. HOWE, restricting her freedom of movement, without privilege or lawful justification.

338.    Mx. HOWE was conscious of their confinements by Defendants.

339.    Mx. HOWE did not consent to their confinements by Defendants.

340.    No reasonable police officer would have believed that they had lawful cause to seize, detain, or arrest Mx. HOWE.

341.    ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE did not have individualized probable cause to seize, detain, or arrest Mx. HOWE.

342.     As a direct and proximate result of the deprivation of their constitutional rights, Mx. HOWE suffered injuries and damages.

343.     ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE's actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

### NINTH CLAIM FOR RELIEF

**Assault and Battery**
***Pursuant to New York State Law***
**(HOWE vs. CITY, ARCHETKO, CELENTANO, KIRK, HOGG, TURNE and ANZALONE)**

344.     All preceding and subsequent paragraphs are incorporated by reference.

345.     Sergeant ROBINSON tackled Ms. MCGAFFIGAN off her bicycle to the ground.

346.     ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE violently seized Mx. HOWE, threw them to the ground, pepper sprayed them directly in the face, attacked them with pepper balls, struck them in the head and body, placed their full body weight on top of them, and handcuffed them in an unreasonably tight manner.

347.     By the aforedescribed conduct, defendants, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered Plaintiff Mx. HOWE, when they, in a hostile and/or offensive manner struck Plaintiff without their consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

348.     Defendants were at all times agents, servants, and employees acting within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

349.     The Defendant CITY, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of respondeat superior.

350.     At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the defendant police officers against Plaintiff.

351.     As a result, Plaintiff was damaged, harmed and injured, and seeks compensation in an amount to be determined at trial.

352.     ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE's actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## TENTH CLAIM FOR RELIEF

**Excessive Force**
***Pursuant to 42 U.S.C. § 1983***
**(HOWE vs. CITY, ARCHETKO, CELENTANO, KIRK, HOGG, TURNE and ANZALONE)**

353.     All preceding and subsequent paragraphs are incorporated by reference.

354.     ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE used force against Mx. HOWE that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them.

355.     It was objectively unreasonable for ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE  to violently seize Mx. HOWE, throw them to the ground, pepper spray them directly in the face, attack them with pepper balls, strike them in the head and body, place their full body weight on top of them, and handcuffed them in an unreasonably tight manner.

356.     The types and levels of force ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE used against Mx. HOWE were in contravention of, or inconsistent with, related RPD policies and/or training.

357.    As a result of the acts and omissions of ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE, Defendants deprived Mx. HOWE of thier federal, state, and/or other legal rights; caused Mx. HOWE bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Mx. HOWE to expend costs and expenses; and/or otherwise damaged and injured Mx. HOWE.

358.    As a result of the foregoing, Plaintiff suffered injuries and damages.

359.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**ELEVENTH CLAIM FOR RELIEF**

**Malicious Prosecution**
***Pursuant to 42 U.S.C. § 1983***
**(HOWE vs. ARCHETKO, CELENTANO, KIRK, HOGG, TURNE and ANZALONE)**

360.    All preceding and subsequent paragraphs are incorporated by reference.

361.    The RPD Officers, acting individually and in concert, initiated the prosecution of Plaintiff, despite knowing that probable cause did not exist to arrest and prosecute her for any crime.

362.    False and fabricated evidence was given by the RPD officers to the District Attorney's Office.

363.    The RPD officers knew or were deliberately and recklessly indifferent to the truth that probable cause did not exist to arrest and prosecute Plaintiff.

364.    There was actual malice and an absence of probable cause for the criminal proceeding against Plaintiff and for each of the charges for which she was prosecuted.

365.    On November 2, 2020, the prosecution terminated in Plaintiff's favor when the Judge dismissed the prosecution for facial insufficiency; which in the context of the prosecution indicated a lack of reasonable grounds for the prosecution. *Ashley* v. *City of New York*, 992 F.3d 128, 140–41 (2d Cir. 2021).

366.    Notably, the prosecution declined the opportunity to supersede the deficient pleading, which demonstrates that the prosecution's dismissal indicates that Mx. Howe was not guilty.

367.    As a direct and proximate result of the RPD officers' actions, Plaintiff was wrongly prosecuted for approximately two months and suffered the other grievous and continuing injuries and damages as set forth above.

368.    As a result, Plaintiff was damaged, injured and harmed, and seeks compensation in an amount to be determined at trial.

369.    ARCHETKO, CELENTANO, KIRK, HOGG, TURNE and ANZALONE's actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

**TWELFTH CLAIM FOR RELIEF**
**Malicious Prosecution**
***Pursuant to New York State Law***
**(Plaintiff against CITY, (HOWE vs. ARCHETKO, CELENTANO, KIRK, HOGG, TURNE and ANZALONE)**

370.    All preceding and subsequent paragraphs are incorporated by reference.

371.    By the actions described above, ARCHETKO, CELENTANO, KIRK, HOGG, TURNE and ANZALONE and the CITY jointly and severally, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued and/or caused the initiation or continuation of, criminal proceedings against Plaintiff.

372.    By the actions described above the CITY and the RPD officers each violated good and accepted police practices.

373.    On November 2, 2020, the prosecution terminated in Plaintiff's favor when the Judge dismissed the prosecution for facial insufficiency; which in the context of the prosecution indicated a lack of reasonable grounds for the prosecution. *Ashley* v. *City of New York*, 992 F.3d 128, 140–41 (2d Cir. 2021).

374.    Notably, the prosecution declined the opportunity to supersede the deficient pleading, which demonstrates that the prosecution's dismissal indicates that Mx. Howe was not guilty.

375.    There was no probable cause for the commencement or the continuation of the criminal proceedings.

376.    The RPD officers acted with actual malice.

377.    The CITY and RPD employed the RPD officers, who were at all times agents, servants, and employees acting within the scope of their employment with the CITY and the RPD, which are therefore responsible for their conduct.

378.    The CITY, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of respondeat superior.

379.    As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed.

380.    ARCHETKO, CELENTANO, KIRK, HOGG, TURNE and ANZALONE's actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

### THIRTEENTH CLAIM FOR RELIEF

**Evidence Fabrication / Denial Of Fair Trial**
*Pursuant to 42 U.S.C. § 1983*

**(HOWE vs. ARCHETKO, CELENTANO, KIRK, HOGG, TURNER and ANZALONE)**

381.    All preceding and subsequent paragraphs are incorporated by reference.

382.    Defendants deliberately fabricated information in police reports and other arrest paperwork that they knew was likely to influence a jury's verdict, forwarded that fabricated evidence to prosecutors, and Plaintiff suffered a deprivation of life, liberty or property as a result.

383.    Defendants' actions violated Plaintiff's rights pursuant to the Fifth and Fourteenth Amendments to the United States Constitution, to due process of law and to a fair trial, and as such, they are liable to plaintiff under 42 U.S.C. § 1983, for compensatory and punitive damages.

384.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer economic injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, economic damages, legal expenses and damages to their reputation and standing within the community.

385.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTEENTH CLAIM FOR RELIEF:
### Municipal Liability

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' First, Fourth and Fourteenth Amendment Rights At the Summer and Fall 2020 Racial Justice Protests***
**(Against the CITY)**

386.    All preceding and subsequent paragraphs are incorporated by reference.

387.    All of the wrongful acts or omissions complained of herein against Plaintiffs and other protesters were carried out by the individually named and unnamed RPD officers pursuant to: (a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so

widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendants CITY and its policymaking officials; (d) Defendant CITY's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by they CITY'S failures, and the failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite full knowledge of the their wrongful acts against Plaintiffs and other protesters, as described herein.

388.    Former Chief Singletary, a municipal policymaker, implemented and ratified the RPD and City's violent and unlawful response to protesters on May 30, 2020 and on and after September 2, 2020.

389.    As detailed herein, former Chief Singletary provided the orders to quell protests (rather than to simply prevent a riot), which caused the violations of Plaintiffs' Constitutional rights.

390.    Singletary gave RPD officers the green light to use military-grade equipment— including pepper spray, tear gas, pepper balls, flash bangs, and other less lethal munitions—to inflict pain as a deterrent to suppress lawful First Amendment activities. As detailed herein, RPD officers implemented these customs or policies.

391.    Thus, these policies and customs of the City were the direct and proximate cause of Plaitniffs' injuries, detailed herein.

392.    Additionally, RPD officers received minimal and ineffective training from the City, RPD and Singletary regarding the need to handle protesters without using force or using the least amount of non-lethal force necessary.

393.    As to discipline, as detailed above, even though the RPD officers' video-recorded conduct was clearly improper, there have been no reports by officers of excessive force by others during the protests, no disciplinary actions or criminal charges for excessive force, and no efforts to relieve violent officers from duty or to remove them from any of the special protest response teams.

394.    As such, the City is liable to Plaintiffs under *Monell*.

### FIFTEENTH CLAIM FOR RELIEF:
### Municipal Liability

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' First, Fourth and Fourteeth Amendment Rights During the Summer and Fall 2020 Racial Justice Protests* (**Against the COUNTY and BAXTER**)

395.    All preceding and subsequent paragraphs are incorporated by reference.

396.    All of the wrongful acts or omissions complained of herein against Plaintiffs and other protesters were carried out by the individually named and unnamed MCSO employees and/or Sheriff's Deputies pursuant to: (a) formal policies, rules, and procedures of Defendants COUNTY and BAXTER; (b) actions and decisions by policymaking agents of the COUNTY, including, but not limited to, Defendant BAXTER; (c) customs, practices, and usage of the MCSO that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendants COUNTY, MCSO and BAXTER, and other policymaking officials; (d) Defendant COUNTY and BAXTER's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by their failures, and the failures of the other policymaking agents, to train, supervise, and discipline MCSO employees and/or Sheriff's Deputies, despite full knowledge of the their wrongful acts Plaintiffs and other protesters, as described herein.

397.    BAXTER, a municipal policymaker, implemented and ratified the MCSO and COUNTY'S violent and unlawful response to protesters on May 30, 2020 and on and after September 2, 2020.

398.    As detailed herein, BAXTER provided the orders to quell protests (rather than to simply prevent a riot), which caused the violations of Plaintiffs' Constitutional rights.

399.    BAXTER gave Sheriff's Deputies the green light to use military-grade equipment—including pepper spray, tear gas, pepper balls, flash bangs, and other less lethal munitions—to inflict pain as a deterrent to suppress lawful First Amendment activities. As detailed herein, Sheriff's Deputies officers implemented these customs or policies.

400.    Thus, these policies and customs of the COUNTY were the direct and proximate cause of Plaintiffs' injuries, detailed herein.

401.    Additionally, Sheriff's Deputies received minimal and ineffective training from the COUNTY and BAXTER regarding the need to handle protesters without using force or using the least amount of non-lethal force necessary.

402.    As to discipline, as detailed above, even though the Sheriff's Deputies' video-recorded conduct was clearly improper, there have been no reports by Sheriff's Deputies of excessive force by others during the protests, no disciplinary actions or criminal charges for excessive force, and no efforts to relieve violent Sheriff's Deputies from duty or to remove them from any of the special protest response teams.

403.    As such, the COUNTY is liable to Plaintiffs under *Monell*.

**WHEREFORE** and in light of the foregoing, Plaintiffs demand judgment on all claims for relief:

a.    Empanel a jury;

b.    Award compensatory and punitive damages;

c.    The Plaintiffs demand the foregoing relief jointly and severally against all of the defendants in an amount in excess of the jurisdiction of all lower Courts, except that the punitive damages demands are, as a matter of law, not recoverable against a municipality and therefore are not made against the City;

d.    Award Plaintiff reasonable attorney's fees and costs, and interest pursuant to 42 U.S.C. § 1988; and

e.    Such other and further relief as the court may deem just and proper.

Dated: New York, New York                    Respectfully Submitted,
      November 19, 2021
                                             ROTH & ROTH, LLP.

                                             ~//s//~
                                             Elliot Dolby Shields
                                             Co-counsel for Plaintiffs
                                             192 Lexington Avenue, Suite 802
                                             New York, New York 10024
                                             (212) 425-1020

                                             Donald Thompson
                                             Co-counsel for Plaintiffs
                                             16 West Main Street, Suite 243
                                             Rochester, New York 14614
                                             Ph: (585) 423-8290